EDNA DICKEY, Respondent, v. WESTERN TABLET
COMPANY, Appellant.*

Kansas City Court of Appeals. November 10, 1924.

1. **MASTER AND SERVANT:** Negligence: Testimony as to Whether Bronzed Powder Was Absorbed into Abrased and Bleeding Thumb Causing Infection Held Not so Inherently Unbelievable as to Justify Taking Case from Jury. In an action for damages to employee by infection claimed to have resulted from absorption into abrased and bleeding thumb of bronze powder which came from a design upon ink tablets plaintiff was required to wrap, in view of other evidence, testimony of plaintiff and her sister as to seeing green and small particles of bronze come out of infected thumb tending to show some of powder was absorbed by the thumb *held* not so inherently unbelievable as to justify sustaining a demurrer to the evidence.

2. **WORDS AND PHRASES:** Word ''Infection'' Defined. Whatever the medical understanding of the word "infection" may be, the layman's understanding of the word is that it is caused by any noxious substance inserted into the flesh whether the substance be a germ or poison.

3. **MASTER AND SERVANT:** Negligence: Failure of Plaintiff to Use Rubber Finger Stalls Held Not to Prevent Recovery Caused

(253)

by Infection. Where employee received infection from absorption into abrased and bleeding thumb of bronze powder which came from ink tablets plaintiff was wrapping, the failure of plaintiff to use rubber finger stalls *held* not to prevent recovery where it was not pleaded as a defense and plaintiff testified it was impossible to do work she was required to do with finger stalls on the thumb.

4. **NEGLIGENCE: Question Whether Defendant by the Exercise of Ordinary Care Could Have Known of Danger of Infection Held for Jury.** Question of whether defendant could have known by the exercise of ordinary care of danger of infection to plaintiff in handling ink tablets upon which there was bronze powder claimed to be poisonous *held* for the jury.

5. ————: **Evidence as to Effect of Work upon Fingers of Other Employees in Handling Ink Tablets Held Competent to Show Knowledge of Employer as to Danger of Infection.** Evidence that work plaintiff was engaged in would cause wearing off of the skin on thumbs of employees was competent on question of knowledge of employer as to danger of infection.

6. **TRIAL PRACTICE: Motion to Strike Out After Witness Had Answered Held Too Late to be Considered as an Objection.** Where motion was made to strike out testimony after witness had answered *held* too late to be considered as an objection.

7. **EVIDENCE: Testimony as to What Happened After Bronze Powder Came in Contact with Skinned Finger Held Competent.** Testimony that a witness skinned his finger and after it came in contact with ink tablets upon which there was a bronze powder claimed to be poisonous, it swelled up and pus started to form in it, *held* competent as describing what happened, and not a statement that the bronze caused the swelling.

8. ————: **Analytical Chemist of Long Experience in Copper with General Knowledge of Therapeutic Chemistry Held Competent as Expert as to Poisonous Effect of Copper.** An analytical chemist with long experience in copper and other metals who had studied therapeutic chemistry in a general way but had never practiced medicine *held* competent as an expert in reference to the poisonous effect of copper.

9. **INSTRUCTION: Instruction Authorizing Recovery Held Not Erroneous as Submitting to Jury Issue That Defendant Was Not Responsible for.** An instruction requiring jury to find that plaintiff's thumb was "on account of the nature of the work required by defendant" raw, worn, sore and bleeding, *held* not erroneous as submitting to jury issue that defendant was responsible for the worn

Dickey v. Western Tablet Co.

and bleeding condition of plaintiff's thumb and entitled to recover on that account.

10. ———: **Obscurity in Plaintiff's Instructions Held Not Reversible Error Where Removed by Defendant's Instructions.** Even if plaintiff's instructions were somewhat obscure on question of whether plaintiff was poisoned or infected from any other cause than copper contained in bronze upon ink tablets, the error was not reversible where defendant's instructions removed the obscurity by making the matter perfectly plain.

11. ———: **Amending Instruction by Striking Out Portions Thereof Not Error Where Covered by Other Given Instructions.** There was no error in court amending instruction by striking out portions thereof where the stricken portion was covered by other given instructions.

12. ———: **Amendment of Instruction Based upon an Erroneous Theory Held Harmless.** Where instruction that, "if condition of plaintiff's thumb was from infection and not from copper poisoning resulting in infection," verdict should be for defendant, was based upon an erroneous theory that there was a difference between copper poisoning and infection, court's amendment thereof so as to read that, if condition "was from some other infection, and not from copper poisoning resulting in infection," *held* harmless.

13. **DAMAGES:** **A Verdict of $3000 for Infection of Right Thumb Requiring Removal of Bone to First Joint, Affecting Use of Two Fingers Adjoining and Permanently Disabling Plaintiff from Doing Usual Work, Held Not Excessive.** Infection of right thumb requiring removal of bone down to the first joint thereof, and rendering joint stiff, and thumb, hand and arm to swell and become extremely sore, resulting in plaintiff suffering extreme pain and being unable to sleep and permanently disabling plaintiff from doing work she had been doing and affecting use of two fingers adjoining, a verdict of $3000, *held* not excessive.

---

*Headnotes 1. Master and Servant, 39 C. J., Section 1310; 2. Infection, 31 C. J., p. 1180; 3. Master and Servant, 39 C. J., Section 1058; 4. Master and Servant, 39 C. J., Section 1384; 5. Master and Servant, 39 C. J., Section 1235; 6. Trial, 38 Cyc., p. 1407; 7. Evidence, 22 C. J., Section 662; 8. Evidence, 22 C. J., Section 765; 9. Master and Servant, 39 C. J., Section 1402; 10. Master and Servant, 39 C. J., Section 1443; 11. Trial, 38 Cyc., p. 1711; 12. Master and Servant, 39 C. J., Section 1443; 13. Damages, 17 C. J., Section 434.

Appeal from the Circuit Court of Buchanan County.—
Hon. L. A. Vories, Judge.

AFFIRMED.

*Mytton & Parkinson* and *Sam Wilcox* for respondent.

*Randolph & Randolph* and *A. M. Evans* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $3000 and defendant has appealed.

The facts show that prior to November 11, 1922, plaintiff, a married woman, was employed by the defendant in its factory as a wrapper of tablets. She had worked for five years for the defendant who was engaged in the manufacture of tablets in the City of St. Joseph, Mo. These tablets consisted of ink tablets and pencil tablets, the latter known as the "Big Chief Tablet." There was a design on the front cover of the Big Chief Tablet consisting of the head of an Indian done partly in gilt or bronze inclosed in a double frame of the same decorative material. The greater part of plaintiff's work was to wrap the Big Chief Tablets. These tablets were brought to plaintiff upon a dolly to be wrapped in bundles of twelve. She would lift them off of the dolly and count out the tablets for the bundles, placing six of them with the top, or bound edge, in one direction and six in another direction. She would then end them up so as to make an even pile and wrap them with paper. She would then secure them with tape which consisted of a tough piece of paper about seven-eighths of an inch wide with mucilage or glue on one side of it. She used her right thumb in counting and taping the tablets. In wrapping the tablets she rubbed the tape down with her right thumb in order to make the tape stick and the glue on the tape adhered to her fingers.

The tablets at the top were bound in green tape. This was glued and would often come loose and in order

to securely fasten the leaves of the tablets this tape would be wet by defendant, and plaintiff required to rub it down with her thumb. The green coloring of this tape when wet would cause her thumb to become discolored with the green, and the constant use of her thumb in the way described caused the skin to wear off and her thumb to become worn, raw, sore, and to bleed. This was the condition of her thumb on November 11, 1922, when it began to swell. When she returned to the factory she was put on other work at which she continued until December 17th, and on the 18th the thumb had become so swollen and painful that it was lanced to the bone by Dr. Gray. The doctor advised plaintiff to go home and soak the thumb and put flax seed poultices on it. This she did. When she removed the poultice she and her sister saw green and small particles of the bronze that had come out of the thumb. She suffered for sometime with her thumb and, finally, the first joint had to be removed.

Plaintiff testified that in handling the tablets the bronze would fly into the air and would get ''all over the ends'' of the tablets. The tablets would at times be stuck together at the green tape and in pulling them apart the tape would come off ''and the bronze flying in the air settle all over you.'' Plaintiff further testified that during the five years that she had been there it was a common thing for the fingers of the girls to wear off and bleed from handling the tablets as she did. There was other evidence to the same effect. Plaintiff's sister also worked at the factory and testified in answer to a question as to what difference she had noticed between the girls who worked on the Big Chief Tablets and those that worked on other tablets, that the girls who worked on the former would have bronze all over their necks, hands and arms caused by bronze flying in the air, and that this caused them to have a light rash. The man who ran the stripping machine that put the green tape on the top edge of the tablets, testified that in running

218 Mo. App.—17.

the machine he skinned his finger and in putting the tablets through the machine bronze was rubbed on this finger which afterwards swelled up and "pus started in it."

Plaintiff's chemist testified that he analyzed the composition of the. Indian head on one of the tablets; that he took an erasing knife and pealed the bronze.off of the tablet as thin as he could; that some paper was attached to the bronze; that he found copper present in the material used to the extent of 3.14 per cent by weight. He also found a trace of arsenic but not in an amount sufficient to be injurious; that he was unable to say what was the relative percentage of paper and bronze in the material but that there was much more paper by weight than bronze. He also testified that open wounds are commonly kept from being contaminated by copper because copper is considered to be infectious and it aggravates the trouble.

Defendant's chemist testified that copper is not poisonous or infectious but that copper reacting with other substances forming a soluble copper compound was poi· sonous and plaintiff's chemist testified that if copper powder is moistened by coming in contact with sweaty hands it might generate salts which would be injurious; that in time you would get a chemical reaction from perspiration upon copper. There is no evidence that the green dye on the binding of the tablet was in any way poisonous or infectious.

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given. In support of this defendant points out the well known fact that infection in a sore or abrased part of the skin may be caused by its coming in contact with many objects; that harmful germs are very generally present; that copper articles such as pennies and cooking utensils are commonly used without any deleterious results, and points to defendant's evidence that seventy million tablets are made by it each year and used by school chil-

dren generally over the country, and that there had been no complaint to defendant of any injury caused by these tablets. Defendant attacks the testimony of plaintiff and her sister that they saw green and small particles of bronze that had come out of the thumb. In this connection it is argued that the copper powder could not have been absorbed into the abrased and bleeding portion of the thumb; that it could only have got in the thumb after the doctor lanced it and if it had been there at the time he lanced it, the disinfectant he used in washing out the wound would have destroyed any germ present.

Plaintiff testified that a day's work consisted in wrapping 1400 to 1600 tablets. Of course, in handling these tablets her hands and fingers would necessarily come in contact with the bronze upon the Indian head. The evidence was that this bronze consisted of very fine particles amounting substantially to a powder; that it readily came off of the tablets when they were being handled; that it floated in the air and got upon the edges of the tablets. Defendant would have us find as a matter of law that it was impossible for this bronze to be absorbed by a bleeding or abrased finger or thumb. It introduced at the trial no medical testimony upon this subject and it would seem that if there is merit in its contention that it could have been easily proved by competent medical testimony. Defendant refers us to the affidavits of doctors filed by it in support of its motion for a new trial. While we cannot consider these it is a matter for passing comment that the affidavits do not say that powdered copper may not be absorbed by the human flesh where the skin is gone, but say "that metal copper is not absorbed *through the skin* and does not act *on the skin* in any way to produce poisoning." In such a situation we cannot say that the testimony of plaintiff and her sister tending to show that some of the powder was absorbed by the thumb, is inherently unbelievable. Cleaning out the wound after the lancing of the thumb and the

insertion of the antiseptic might have destroyed such germs as it came in contact with, but not the poison that may have been present in the tissues that was afterwards drawn out by the poultice. Aside from the testimony that the bronze came out of the thumb, there was testimony of other witnesses tending to show that bronze getting on the bruised parts of fingers would cause rash and infection.

We are not impressed with defendant's contention that there is a distinction between infection and poison; that infection is caused by a germ and not poison, and its contention that plaintiff's case is based upon the theory of copper infection when there is no such thing. Whatever the medical understanding of the word infection may be, the layman's understanding of the word is that it is caused by any noxious substance inserted into the flesh, whether the substance be a germ or poison. Some of the witnesses referred to copper poison as an infection. Although in the argument defendant's counsel laid great stress on the difference between infection and poison, we fail to see in the circumstances of this case what bearing it has on it.

There is nothing in the contention that plaintiff should not be allowed to recover for failure to use finger stalls. This was not pleaded as a defense and plaintiff testified that while finger stalls were furnished they could not be used upon the thumb, that it was impossible to do work such as she was required to do with rubber on the thumb. Nor is there anything in the contention that defendant did not or could not have known by the exercise of ordinary care of any danger or likelihood of infection from handling the tablets. The evidence was that it was a common thing for wrappers of these tablets to have their fingers sore and bleeding; that employees suffered from rash in handling them and there was one witness whose testimony tends to show that he was poisoned. The fact that defendant may not have had any complaint of poison from the users of the tablets would not take

Dickey v. Western Tablet Co.

the question from the jury in any event. The users of the tablets did not handle them by the thousands and would not ordinarily have bruised fingers or hands and if one of them did get poisoned from a tablet, it is by no means certain that he would discover that it was caused by the bronze on it. It was for the jury to say under the circumstances whether defendant could have known by the exercise of reasonable care of the danger in handling the tablets in question. The demurrer to the evidence was properly overruled.

There was no error in connection with the admission of testimony. It was competent to show that the work of handling the tablets such as plaintiff was engaged in would cause the wearing off of the skin on thumbs of the employees. This evidence was competent on the question of knowledge of the employer of the fact that the work was such as to cause a condition in the fingers of the employees which offered an opportunity of infection from the bronze particles. This fact was a very necessary matter to be shown in order to fasten liability upon the defendant for the poisoning of plaintiff's fingers. While defendant may not have been responsible for the worn and bleeding fingers of the employees, no attempt was made to recover on account of plaintiff's finger getting in such condition.

We do not find that plaintiff's witness, Willis, testified as to the effect of the bronze on the Indian head coming in contact with an abrased or bleeding finger. The witness was asked about this several times but his answers were not responsive. Finally, upon a question by the court, he stated that he did not know anything about it. Plaintiff's witness, Mrs. Rutan, did not testify as to the effect upon the abrased fingers of bronze coming in contact with them. Such a question was asked the witness but was never answered, but rather the question of the court (which was not objected to) to the effect as to what the witness observed as to any condition of those who worked on the tablets with the bronze that was different from that of those who worked on other tablets.

There was no objection to witness Reeves's testifying that he skinned his finger and it swelled and pus started to form in it after it came in contact with the bronze on the tablets. Defendant moved to strike out the testimony after the witness had answered but this came too late to be considered an objection. However, we think the testimony was competent. He was merely asked what happened to his finger after it came in contact with the bronze and he answered "It all swelled up and pus started in it," which was merely describing what happened after the bronze came in contact with the finger, and not a statement that the bronze caused the swelling.

It is insisted that the court erred in permitting plaintiff's expert witness, Dr. Thomas, over the objection of the defendant, to state that copper was infectious when it came in contact with wounds or abrasions of the skin, for the reason that the doctor was not qualified as an expert to give an opinion on the subject. This objection is based upon the fact that Dr. Thomas was an analytical chemist and not a therapeutic chemist. Dr. Thomas graduated in 1894 from the University of Missouri where he took a course in chemistry and metallurgy in the School of Mines and had been an analytical chemist for twenty-nine years. Until the last five years he had been associated with various copper mining companies in this country and South America when he became, and is, an analytical chemist in St. Joseph. He stated, however, that he had studied therapeutic chemistry in a general way but that he had never practiced medicine. We think that an analytical chemist with the experience in copper and other metals that this witness had, together with his general knowledge of therapeutic chemistry, made him competent as an expert witness in reference to the poisonous effect of copper.

It is insisted that the court erred in giving plaintiff's instruction No. 1 because "it emphasizes the erroneous testimony as to the fingers becoming worn by the handling of the tablets" and it submitted to the jury the issue that defendant was responsible for the alleged raw and

bleeding condition of plaintiff's thumb. We do not find any such emphasis. It was necessary for the jury to find that the fingers were worn or abrased and this the instruction submits in the ordinary way. But the instruction does have the jury find that plaintiff's thumb was *"on account of the nature of the work required by defendant* to be performed by plaintiff, raw, worn and sore and bleeding and the skin and flesh worn therefrom," and that defendant knew or by the exercise of ordinary care could have known of such condition, etc. It is insisted that by reason of the use of the words "on account of the nature of the work required by defendant to be performed by plaintiff," it submitted to the jury a question of defendant's being responsible for the worn and bleeding condition of plaintiff's thumb whereas it was not responsible for this. It may not have been necessary for plaintiff to submit the question as to who was responsible for the condition of plaintiff's thumb, but this was not submitted as a part of the negligence of the defendant. The evidence shows that it was on account of the nature of the work being done that plaintiff's thumb became raw and bleeding and the instruction in this part merely follows the petition and the evidence. What possible harm it could have done defendant we are not able to see. Nor does the instruction disclose that the jury could have obtained an erroneous idea from the instruction that plaintiff was entitled to recover on this account. The negligence of the defendant submitted in the instruction had to do solely with the poison or infectious bronze on the tablet. The instruction told the jury—

". . . if you further find from the evidence that the defendant carelessly and negligently made and furnished plaintiff to handle and wrap tablets with the back or cover upon the same bearing a figure or design which contained *poison or other substance or ingredient which was likely to and would cause infection* when it came in contact with the raw, sore or bleeding part of the hand or thumb, if any." (Italics ours.)

In reference to the italicised part of the instruction just quoted it is insisted that it gave the jury a roving commission to "wander and speculate as to whether there were other substances or ingredients likely to cause infection." The only substance in the tablet which was poisonous or could have caused infection, was copper. If the instruction had used the word "copper" instead of poison, there might be some merit in defendant's contention but it used the word poison, and the phrase "or other substances or ingredients which was likely to and would cause infection" following that word, is merely another way of describing the material in the tablet that caused the infection. In a number of defendant's instructions the jury were told that if plaintiff was poisoned or infected from any other cause than the copper contained in the bronze, their verdict should be for the defendant. If it can be said that plaintiff's instruction was somewhat obscure upon this point, and certainly there is no more serious defect in it, defendant's instructions removed the obscurity in plaintiff's instruction by making the matter perfectly plain and there was no reversible error. [Sutter v. Met. St. Ry. Co., 208 S. W. 851.]

There was no error in the court's amending defendant's instruction No. 5. The court struck out of that instruction, which is a long one submitting a great many separate and distinct circumstances which would cause the jury to find for the defendant, a paragraph stating that if defendant exercised ordinary care in bronzing the tablets and in the selection of material therefor, their verdict should be for the defendant. Of course, it is not the exercise of ordinary care in bronzing the tablets to make them good commercial tablets that is involved, but the exercise of ordinary care in furnishing tablets so as not to poison employees who were required to handle them. While it might not have been error for the court to have given the instruction as it read, it was perhaps somewhat obscure on this point. But be that as it may, this issue was fully covered by defendant's instruc-

tions Nos. 6 and 8. The instruction also sought to tell the jury that "if the condition of plaintiff's thumb was from infection and not from copper poisoning" their verdict should be for the defendant. This was amended by the court so as to read that if this condition "was from some other infection and not from copper poisoning resulting in infection, then their verdict must be for the defendant." We assume that when it submitted this part of the instruction defendant had in mind its theory that there is a difference between copper poisoning and infection, that is to say, that the latter, as we have before stated, can only be caused by a germ. We see no harm in the court's amendment. From what we have said there was no conflict between plaintiff's instruction No. 1 and defendant's instruction No. 5, nor was there any error in plaintiff's instruction No. 2, which merely defined in proper form the terms "negligently" and "ordinary care."

It is insisted that the verdict is excessive. The facts in this connection show that as a result of the infection plaintiff's right thumb, hand and arm became extremely sore. The whole right arm swelled so that she came near losing it. She suffered extreme pain and was unable to sleep. The bone down to the first joint of the right thumb was removed rendering the joint stiff and she was thereby permanently disabled from doing the kind of work she had been doing. The thumb has no circulation and becomes numb and is of no use. The loss of the use of the thumb has affected the use of the two fingers adjoining. For medicines and doctor's bills she incurred an expense of $86. We do not think that we would be justified in interfering with the verdict of $3000 under the circumstances.

The judgment is affirmed. All concur.